May I please the court, Alvin Gomez on behalf of Sylvia Fletes de Paloma. Is it Fletes? Correct. Okay. I reserve five minutes for rebuttal. Thank you, Your Honor. Your Honor, this is a classic case of a question of fact for a jury to decide. One fact alone tells us this. The question at page, volume 4, page, tab 36, page 4, question of Mr. Troncal, Officer Troncal. And did you have any difficulty seeing the driver when you fired your round? Answer, yes. What did you see of the driver when you fired your round? A, I did not see the driver. So throughout this case, the City of San Diego focuses on a videotape. The videotape is essentially infrared where you can't see the actual images of what was transpiring on on January 12, 2013. Well, actually, I've looked at that. You can see a lot. You can see where the officers are. You can see the one seemingly falling down that was going to get run over if something hasn't happened. And then, you know, then they're firing. They all say to hit the driver. They weren't trying to hit Ms. Fletes. All right. I understand what you're saying. Look at volume 2, tab 16, page 52. This photograph says it all. When you look at this photograph, what you have is, you have essentially over here, you have the car, the front of the car. You have the officer's car right over here. And then you have the officer go in front of the vehicle. We know very well, if you look at the videotape closely, that the Officer Gallegos, when he arrives at this, the area, he stops. He reverses. And the reason he stops and reverses is because he sees a bush there, an obstruction. That obstruction is the obstruction in which this car stops and can't move any forward, and you can't go any forward. The car in which Ms. Fletes was in? Correct. Okay. And so, visualize that. And so the videotape doesn't tell the full story because the videotape, you cannot see the bush. How big is the bush? The bush is in diameter around three feet in diameter. It's a big bush. How tall is it? The height of it is, when you look at the photographs, it's taller than the front end of the police car. And the police car has its headlights on. And so when the police car comes, it sees it. Goes for, moves back. Why does it move back? Is the bush a trunk or is the bush a bush? It's a bush that underneath the bush is a trunk, a tree trunk. Did you see the trunk? I think you can't see the tree trunk when you look. It's really dark and you're being, and you're chasing somebody and somebody's about to run over you. The officer could have looked at the bush and seen that there was a trunk underneath and then made the judgment in that split second that the car could not have gotten over the trunk? Well, the officer, I like that question for the reason being is the officer had his headlights on. You could see up to 100 feet in front of you. The officer was totally aware that something was there that obstructed him from going forward because had he gone forward, he would have hit the bush. He would hit the tree. You know, the, my recollection is that the car was quite a bit back from the, uh, the, the, the car in which Ms. Fletch was riding. Correct. Was back quite a ways from the police car when it backed up. In other words, it seems like the bush that stopped the car in which Ms. Fletch was riding may not have been what stopped the officer from going forward initially. Oh, is it same bush? You're sure? Oh, positive. 100%. Look at the photograph as I depicted on volume two, uh, tab 16 page. And is there testimony on the record that the officer backed up his police car because he ran into the bush or he saw the bush? He said he stopped. He never said I said he stopped, but I, you can see that he stopped and he backed up, but did he stop because he ran into the bush? He never testified as to, I didn't think so because it looks like it. There's some distance there. And then he walked forward and fell down. And it looked like the, uh, driver of the vehicle in which Ms. Fletch was riding was coming to get him and then ran into the bush. Well, but I think that's a, that's a question of fact for a jury to decide whether or not the person is coming towards him because remember, well, the car was coming toward him. It stopped. That may be a question as to, I mean, you can see it. Well, yeah, but you don't know the intent of the driver. The driver's dead because the driver, remember when he comes in, he goes through the driveway at an angle. He turns left. There's a wall there. He backs up. And as he backs up, then he starts going forward as it's a tree, right? Yes. It's a back. He backs up and hits a tree and then comes at the police officer. Well, I don't think the police officer, remember. Well, I saw the video. One of the officer's obligation is to what? Not place themselves in a position of harm. One, he should have never got out of the vehicle. The reason he shouldn't have got out of the vehicle is because he. Well, just a minute. That's a great argument, but the bottom line is at the time that they exited their vehicles, they had him to some extent cornered and they were preventing him from running. That's their testimony. Well, that's kind of illogical because the way they're trained is you never sergeant. They were preventing him from running off. He'd already had a high speed chase, but he hadn't exited the vehicle. So that be lies, but just a minute, he turned left. He stopped in front of the retaining wall in a dirt lot. And then when they drove up to corner him, they exited their vehicles. He backs up, hits a tree and comes forward going in the direction of the officer. Yeah, but remember, the officers place themselves in that position. The officers place themselves in the position of getting out of the cars going in order to perform what they call a hot stop. Are you relying upon for the idea that after a high speed chase involving great danger to both Ms. Fletchers and the officers and this man who was driving the, if you will, getaway car, he was dangerous to everybody. Are you saying that the officers had to stay in their cars and react to that solely staying in their cars? What are you relying upon for that? Oh, I'm relying upon the fact that you cannot perform a hot stop. And that's what they did. The reason they got out of the car was to perform a hot stop. A hot stop means. And why can't you perform a hot stop? Because the car's moving. You can't perform a hot stop when the car's moving. What they should have done is they should have waited. Says you can't do that. Their policies and procedures. Sergeant Del Toro testified under penalty of perjury. The officer. So the procedures of the city of San Diego forbade performing a hot stop. Is that what you're saying? Correct. When where is that in the record? That's in the record. If you look at the testimony of let's see, I'll find it for you. Officer, even Officer Gallegos testified that he could not perform a hot stop when the vehicle was moving. Right. But at some point, the vehicle was stopped. Correct. It was cornered. But once the vehicle was stopped at the bush, then they could perform the hot stop. But before then, it was stopped once before. No, it's it. It is. He turned left. Just a minute. He turned left and stopped in front of the retaining wall in a dirt lot. It paused. It didn't stop means it's a continuous event. It doesn't mean that it's it's not going to move again because you could see that you could see the tail lights. But then he after the officers got out and one was in front of him, he backs up, hits a tree and comes toward the officer, hits the bush and his wheels were still spinning as if he wanted to go forward after that. Yeah, but the vehicle stopped. Isn't that true? That's correct. But the vehicle is stopped. Did the officers ever warn the driver to stop? According to Miss Fletcher's? No, she never heard anything. It's not according to Miss Fletcher's. According to the evidence we have. Well, Miss Miss Fletcher's presented her declaration. One of the people in the is there and she's the only one who says they didn't ever say to stop. Correct. And that's a question of fact for a jury to decide. Let me ask you another question. What is the evidence that your client was even? An intended object of the seizure. The intended object of the seizure. One all the officer guy goes testified that he notified everyone on the radio. They were on the free call that there's an occupant in the vehicle officer. That doesn't mean anything. Yes, it does. And I'll explain why let me. What you have to suggest is. That somehow your potential or your client is mistakenly stopped right here. There's no question. The car was intentionally stopped. The driver was intentionally stopped. Your client was never intentionally stopped. She was stopped when they fired the rounds at her. She could not get out. Exit the vehicle. You think they were firing the rounds at her? Because if you look at the photographs and you look at the evidence and you look at the diagram depicted by their expert, Mr. Lozinski, and that's a tab three or volume three tab 20 page 25. It shows. It shows that if you're trying to stop, let's say you're trying to stop a car. Correct. Do you shoot the driver or the passenger? You shoot the driver, right? But this show so why do you think that these officers were trying to shoot the passenger? In order to stop the driver from running over the officer. One. The reason they did is because they thought they were going to shoot through her because they shot through the passenger window. Doesn't shooting through somebody slow down the bullet and make it less effective when it's a second person? But remember, it's been my experience. But remember, this is what we call contagious fire. Officer Geigel is the first one that fired the round. These two other officers, Medina, trying to call fired afterwards. Trying to call in Medina admitted that they couldn't see through the side window. So how are they aiming at the driver? If they cannot see, you know where the drivers in the seat in front of the steering wheel, so you don't have to see the driver. You just shoot towards that part of the car, not from the side. You look from the angle. It's from the angle. He's shooting. Here's the passenger window. He's shooting right here. You can't see through the window. It's a tinted window. Every officer testified in a penalty of perjury. They could not see through the window. You're not answering this question because the bottom line is they were shooting at the driver's spot. The driver was there. That's all the testimony. Is there any testimony that there was a whole gang they were shooting at? No. Is there any testimony they were shooting at all three who were in the car? They knew she was in the car. Just a minute. Is there any testimony they were shooting at all three that were in the car? No. There is no testimony they were shooting at all three. There's only testimony they were shooting and it was the driver and your client happened to be in the car. They knew she was in the car, Your Honor. They knew she was in the car. But they didn't aim at her. They were after the driver. But you need to see an object to aim at. You just can't shoot haphazardly. That's like saying... I can tell you haven't shot ducks. But this is not a duck. This is a human being, Your Honor. But I'm just trying to... I threw that in kind of as a way for you to step back and think about this. They were aiming at the driver and whether they could see the driver or not, they were aiming at him. That's their testimony. No, it's not. When you look at the physical evidence, the physical evidence shows that their shots were directed towards the passenger seat. They were directed towards the passenger seat. Look at the trajectory. The trajectory shows that. I think what my colleague is trying to point out is that in the heat of the moment, people's lives, officers' lives are in danger, everybody's life is in danger. They're trying to fire a firearm. They're really hard to aim accurately, but they're trying to protect themselves and they try to fire where the driver is. They're going to miss sometimes and that's what happened here apparently. But again, where's the evidence that they intentionally tried to hit your client? I don't see that in the record. Look at Logzinski's diagram. No, I see that. I see that. That's not your argument. No, that's evidence. That's not argument. That's fact. No, where's the intention? The intention is... That the actus reus is that the bullet went there. I'm saying what's the mens rea that they intentionally fired at your client? When you shoot a weapon, you're aimed to shoot at the target you're aiming at. If they were aiming at him, they would have hit him or his direction. You're saying that as a matter of law, when you shoot a weapon and it goes someplace, that your mens rea is that you intended to hit whatever you were aiming at? That's a fact. It's not... I'm asking what the mens rea is. I'm not asking where the bullet went. The mens rea is, is these officers, they knew when they fired a deadly weapon that the target they aim at is what they're aiming at. They cannot sit there and say, well, oh, by the way, I... There's not one single officer who will ever testify on a penalty of perjury, and that's why the issue of credibility is so important. Not one single person is ever going to sit there and admit, I aimed at her. They have to say that I didn't aim at her because they know very well that they have violated or even committed a criminal act if they say I shot at her. But the physical evidence and the inferences drawn from the physical evidence establish that they were aiming at her. Because if you look at the angles, you're talking about... You're talking one seat, two seat, a console in the middle. You can't be that poor of an aim at ten feet. Well, let me change the subject. I've heard what you have to argue here. Take it under thought and advisement. What evidence is there that the officers intentionally or recklessly provoked a violent response? The violent response? There's no... She didn't do a violent response. There's no violent response. She was an innocent passenger. She was doing nothing, just sitting there. But the provocation doctrine says that a police officer intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation. In this... She provoked the violent response. The next question is, why is that an independent constitutional violation? That's what you got to prove, and I couldn't find it in the evidence. Well, simply put, Your Honor, the officer got out of his vehicle, put himself in harm's way, and the vehicle, for whatever reason... And that was his violent, intentional, or reckless action? Point one.  There was no reason to fire any rounds whatsoever because the vehicle was stopped. But you said it wasn't stopped just a few minutes ago. No, it was stopped. It was stopped. I'm talking about at the time the weapons were discharged, the vehicle was stopped. What we were referring to earlier was the hot stop. You can't perform a hot stop when the vehicle is moving. But at the time the rounds were fired, the vehicle was at a complete stop, not moving. Okay. I don't have any... Any more questions that you have? Okay, thank you. I'll return my time. Thank you, Your Honor. We're going to hear an argument from the city. Good morning. Good morning. May it please the Court. John Riley on behalf of the city defendants. Your Honor, first off, I was glad to hear the provocation doctrine because I think it's important for us to remember that you have to have an independent constitutional tort. Pre-shoot negligence or tactical decisions by the officer are not at issue in this case. What we're looking at is a constitutional violation related to the officer's belief that they face serious bodily injury or death to them or to people around them. Looking at the Scott case, the U.S. Supreme Court case, with a similar video kind of evidence, it makes it clear that we cannot ignore what we see. I don't want to get sucked into quibbling, but I have to address, to say that the officer backed up, I don't think the video record supports that. Certainly the car rolled as he shifted it into gear, but he's nowhere near, as I heard the court point out, the actual bush where the stump was. And even so, there's no indication just because you're at night in a dark alley and you have your headlights on that you see a stump buried in there. That was pure fortuitous good fortune because we all know by looking at that video, had that stump not been there, that officer would have been run over. With that, the video again speaks so clearly. We see a 12-second event. That is what we call immediacy. Any way we look at this thing, we know that there was an immediate concern by everybody there. That brings me to my next point. As the papers describe, this is really a 14th Amendment claim, which creates a higher bar, frankly. The 14th Amendment discusses when someone, like a passenger in the car, is seeking remedy for a constitutional violation, they will have to show under such a tight time frame as this one, and there's no cases that go anywhere near calling 12 seconds enough time to deliberate. And with that, that 14th Amendment is going to describe for the plaintiff, they have a burden to show that there was no legitimate police purpose for using the force that they did in this situation. So then we go on to beyond the video evidence that so clearly speaks for itself. I heard the court inquire about warnings. We do have other people that had testified, I heard the police say before I heard gunshots, something to the effect, stop, show your hands, that kind of thing. And I'd like to remind us that the warning aspects of Gardner or Graham speak to if feasible. And I would put to you under 10 or 12 seconds that were at issue in this case, a warning wasn't necessarily feasible, but here we have it. This case lines up with everything that the Constitution seeks to balance, and that is our civil rights and the rights of the officers here. I have a distinct memory of Judge Houston asking us in court, what would you have these officers do when another officer falls in front of that car? There was no options there. Again, I'll circle back to whether it was a hot stop or not, whether an officer put themselves into a position that allowed the driver to back up. Those are not issues for this constitutional analysis. And at some point we just have to say, what was the driver doing? He was at the end of the road. The race was over. He was stopped. It was his volition that put this thing into action. It was his volition that backed up. It was his volition that came at the officers. So at some point you just have to say, what were the officers supposed to do under this circumstance? I think, as I've said, even looking at it as a Fourth Amendment claim, there's nothing here that we would find unreasonable based on the officer's response to this immediate threat of serious bodily injury or death. I don't want to leave us short on describing what went on that evening. I think the papers speak well to all of the issues that we've heard here today. A lot of what was discussed by the appellant went to a factual issue that, frankly, I don't think exists. There are no genuine issues of material fact beyond those that we've already discussed here as appellees. We see no evidence. Let me just sum up. And I feel, because I have nine minutes left, I don't want to shortchange my clients, but I think we're very clear that there's no genuine issue of fact as to these officers facing serious bodily injury or death. There's no genuine issue of fact that there was immediacy involved here. There's no genuine issue of fact that they did not have time to deliberate. They were simply responding and reacting to somebody who had the upper hand. As we all know, first action wins. The officers were forced to respond to what was handed to them. And here they had a car driving at one of their fellow officers. Speaking of the Lewinsky diagram that is part of the record, it clearly shows the trajectories of the bullets, straight lines towards the driver's seat. That's how you stop a car. You don't shoot at the engine. And even shooting at the engine, we're back to tactics, which is not the analysis for a constitutional violation. We've got the bullets going right at the driver. We can tell, and I heard a gross generalization that they said they were shooting at the passenger. Know what we have when you examine the record is the officer who fell, Officer Gallegos, he clearly, his lines of fire were at the driver and the driver only. We can see from the video that the one officer actually, once the glass tint goes out, and that is Officer Medina, does say at that point, after I had begun shooting or right about that first shot, I do see some hair in the front seat. She was bent down. He does move to accommodate that because he is always and only shooting at the driver. And then the other officer says in his testimony, I never knew there was somebody in the car until after I finished shooting. So again, we have this very, and when we talk about the shooting window, it's even less than the 10 or 12 seconds of the whole event. It's about four or five seconds, maybe even three. So I don't see where we can fault the officers for what they did here. I do not see any evidence of a constitutional violation, let alone a 14th, and at a lesser analysis, the fourth. And if we even got to that, the cases are abundantly clear that if we get the qualified immunity, and I'm not suggesting we have to say the law was not sufficiently clear for an officer to know that they shouldn't have been able to shoot under these circumstances. I'm not saying that at all. I think on the first prong of a Pearson analysis or a Saucier analysis, there was just simply no constitutional violation. But if we did get to the qualified immunity, I don't think you can say it's beyond debate. Much as the recent White-Pauly case describes or the Millinex case describes, it is not beyond debate that what they did was unreasonable or reasonable. So with that, Your Honor, unless the court has any questions that I can address. I think not. We thank you both for your argument. We appreciate it very much. The case just argued is submitted. Thank you very much.
judges: M. Smith, N.R. Smith, Feinerman